# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE EBIX, INC.   :  **CONSOLIDATED**
STOCKHOLDER LITIGATION :  **C.A. No. 8526-VCN**


# MEMORANDUM OPINION AND ORDER


Date Submitted: June 10, 2015
Date Decided:  January 15, 2016

Michael Hanrahan, Esquire, Paul A. Fioravanti, Jr., Esquire, Kevin H. Davenport, Esquire, Eric J. Juray, Esquire, and John G. Day, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Stuart M. Grant, Esquire and Michael J. Barry, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware; and Michael A. Wagner, Esquire of Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania, Attorneys for Plaintiffs.

Samuel A. Nolen, Esquire, Catherine G. Dearlove, Esquire, Susan M. Hannigan, Esquire, and Christopher H. Lyons, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Charles W. Cox, Esquire of Alston & Bird LLP, Los Angeles, California; and John A. Jordak, Jr., Esquire of Alston & Bird LLP, Atlanta, Georgia, Attorneys for Defendants.

NOBLE, Vice Chancellor

# I. INTRODUCTION

Over two years ago, a corporation attempted to complete a going-private merger with a financial partner. Within roughly one month of the participants' announcement of a merger agreement, a dozen lawsuits had been filed and consolidated into the present action. Just as the wheels of discovery began to turn, however, the merger was abandoned. With a sort of Darwinian resilience, this litigation survived this development, as well as several motions to dismiss, through persistent evolution.[1] The present motion to dismiss challenges the third iteration of Plaintiffs' consolidated complaint.

This latest complaint asserts claims—some old, some new—based on conduct that occurred both before the abandoned merger and more than a year after it. In particular, plaintiffs challenge three classes of conduct: (1) directors' disclosures about, as well as the adoption and maintenance of, certain executive compensation agreements; (2) a series of corporate actions directors took in 2014 with an alleged intent to entrench; and (3) disclosures made in a proxy statement issued in advance of the corporation's 2014 annual meeting. Defendants have

---

[1] The first consolidated complaint was filed June 17, 2013. In response to two motions to dismiss filed on July 1, 2013, plaintiffs filed a second consolidated complaint ("Amended Complaint") on August 27, 2013. That complaint withstood, in part, a motion to dismiss filed September 26, 2013. The third consolidated complaint, the Verified Second Amended and Supplemented Class Action and Derivative Complaint ("Second Amended Complaint," "Complaint," or "Compl."), the one the present motion challenges, was filed January 16, 2015.

moved to dismiss on the grounds that two settlements approved by the United States District Court for the Northern District of Georgia extinguished the Second Amended Complaint's counts related to executive compensation, certain claims are moot, and remaining counts fail under Court of Chancery Rule 12(b)(6). For reasons that follow, the motion is granted in part and denied in part.

## II. BACKGROUND

This section assumes the reader's familiarity with this Court's July 24, 2014 memorandum opinion (the "July 2014 Opinion") that describes an appreciable portion of facts relevant to the present motion.[2] The Court cautions, however, that the facts stated in that opinion derive from an earlier complaint (the "Amended Complaint") that is not the operative complaint that Defendants now attack, the Second Amended Complaint.[3] Further, the Second Amended Complaint updates facts alleged in the Amended Complaint and subsequently described in the July 2014 Opinion.[4] These differences only concern conduct that occurred during and before 2013 and, more importantly, do not affect the following analysis. Accordingly, this section only describes new factual allegations in the Second

---

[2] *See In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655 (Del. Ch. July 24, 2014).

[3] Co-lead Plaintiffs in this action are Desert States Employers & UFCS Union Pension Plan ("Desert States") and Gilbert C. Spagnola. Compl. at 1; *see id.* ¶¶ 11–12.

[4] For example, the July 2014 Opinion states that Robin Raina, Ebix's Chairman and Chief Executive Officer, and Raina's foundation owned approximately 9.3% of Ebix's stock as of June 2013. *Ebix*, 2014 WL 3696655, at *2. The Second Amended Complaint provides a 9.9% figure accurate as of 2014. Compl. ¶ 14.

Amended Complaint that are not mere updates—*i.e.*, post-2013 facts—as well as new, relevant facts outside the Second Amended Complaint that the Court may properly consider on a motion to dismiss.[5]

A. *The Federal Securities Class Action Settlement and the Federal Derivative Action Settlement*

The Second Amended Complaint contains six counts: the first three challenge pre-2013 conduct and the following three challenge 2014 conduct. Defendants[6] now argue that two settlements approved by the Northern District of Georgia contain releases that extinguish Counts I–III. This section prefaces discussion of those settlements by briefly summarizing Counts I–III.

The Second Amended Complaint's first three counts concern three documents that either describe or purport to create certain executive compensation arrangements that Ebix, Inc. ("Ebix") entered into in 2009 and 2010: (1) an Acquisition Bonus Agreement ("ABA") authorized in 2009, (2) a 2010 Stock Incentive Plan (the "2010 Plan"), and (3) a proxy statement issued before Ebix's

---

[5] On a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court may consider "allegations in the Complaint, the documents integral to the Complaint, and those matters as to which the Court may take judicial notice under Delaware Uniform Rules of Evidence Rules 201 and 202." *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *12 (Del. Ch. Dec. 20, 2012) (taking judicial notice of "documents filed of record in [an action in the United States District Court for the Southern District of New York] that are not likely to be in dispute.").

[6] Defendants in this action are Ebix and Ebix's board of directors. Compl. ¶¶ 13–19.

2010 annual meeting (the "2010 Proxy Statement") in which Ebix's board of directors (the "Board") recommended approval of the 2010 Plan. In Count I, Plaintiffs challenge the Board members' maintenance of the ABA as a breach of their fiduciary duties because, in Plaintiffs' view, the ABA is an unreasonable antitakeover device by virtue of the payments it authorizes in the event of an acquisition. In Count II, Plaintiffs challenge the 2010 Proxy Statement as materially misleading and incomplete. And in Count III, Plaintiffs challenge the Board members' disbursement of incentive compensation to themselves under the 2010 Plan as a breach of fiduciary duties. These alleged facts and accompanying legal theories overlap with those that animated the two federal actions to some disputed extent.

In the first federal action, filed on November 28, 2011 (the "Federal Securities Class Action"), representative plaintiffs brought class action claims against Ebix and two individuals—Robin Raina, who served as Ebix's CEO, President, and Chairman of the board, and Robert Kerris, who served as Ebix's CFO—for making "materially false and misleading statements [between May 6, 2009 and June 30, 2011] in press releases, analyst conference calls, and filing [sic] with the U.S. Securities and Exchange Commission ("SEC")" in violation of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, as well as

4

Rule 10b-5.[7] In particular, the complaint alleged that defendants had artificially inflated Ebix's stock price by misrepresenting certain financial figures and obscuring both the absence of adequate internal controls and the company's participation in a "sham tax strategy."[8] Accordingly, plaintiffs sought relief for a class of persons who bought Ebix's stock when its price was artificially high and suffered economic harm when the price subsequently fell.[9]

The parties to the Federal Securities Class Action later submitted a stipulation of settlement ("Federal Securities Class Action Settlement") for the district court's approval.[10] On June 11, 2014, the court approved the settlement and certified a class of "all Persons who purchased the common stock of Ebix, between May 6, 2009 and June 30, 2011, inclusive and who were damaged thereby," excluding defendants and certain affiliates, under Federal Rule of Civil Procedure 23.[11] Gilbert Spagnola, an Ebix shareholder who is one of the co-lead Plaintiffs in this action,[12] opted out of the Federal Securities Class Action

---

[7] Transmittal Affidavit of Christopher H. Lyons, Esq. ("Lyons Aff.") Ex. F (Federal Securities Class Action Compl.) ¶¶ 1–7, 11–17, 263–77. *See infra* Part III.A.1 for discussion on this Court's ability to consider items in the federal docket in the context of this motion to dismiss.

[8] Federal Securities Class Action Compl. at 18, 45, 53; *id.* ¶¶ 137, 271.

[9] *Id.* at 149–50; *id.* ¶¶ 19–24.

[10] Lyons Aff. Ex. C (Federal Securities Class Action Settlement); Lyons Aff. Ex. A (Federal Securities Class Action Order).

[11] Federal Securities Class Action Order ¶¶ 3–5.

[12] Compl. at 1.

Settlement by timely requesting exclusion from the class.[13]   As part of the

settlement, the court-appointed lead plaintiff and each class member discharged all

"Released Claims,"[14] which the stipulation broadly defined as:

> [A]ny and all rights, demands, claims (including "Unknown Claims" as defined below), liabilities, suits, debts, obligations, damages, losses, judgments, matters, issues, and causes of action of every nature and description, in law or equity, whether accrued or unaccrued, fixed or contingent, liquidated or un-liquidated, matured or un-matured, known or unknown, discoverable or undiscoverable, concealed or hidden, disclosed or undisclosed, whether arising under federal, state, local, statutory, common law, foreign law, or any other law, rule, or regulation, and whether class and/or individual in nature, that Lead Plaintiff or any Member of the Class asserted, could have asserted, or in the future could or might have asserted in this Litigation or any other action, court, tribunal, proceeding, or forum against any of the Released Persons arising out of, in connection with, or in any way relating to, directly or indirectly, the purchase, acquisition, holding, or sale of Ebix common stock during the Class Period or the acts, facts, matters, allegations, representations, transactions, events, disclosures, statements or omissions that were or could have been alleged or asserted in the Litigation.[15]

In its final judgment and order, however, the district court clarified that "Released

Claims" only include claims that "arise out of the identical factual predicate as the

claims settled in this action."[16]   The order cites two cases—*Thomas v. Blue Cross*

---

[13] Federal Securities Class Action Order ¶ 6, Ex. A.

[14] *Id.* ¶ 6.

[15] Federal Securities Class Action Settlement ¶ 1.21.

[16] Federal Securities Class Action Order ¶ 6 n.1.  Desert States objected to the settlement in the Federal Securities Class Action "on the ground that the Proposed Settlement may release completely unrelated claims currently being litigated in" this action.  Lyons Aff. Ex. G 1–2.  After conducting a fairness hearing at which Desert States appeared, the Northern District approved the settlement over Desert

*& Blue Shield*[17] and *TBK Partners Ltd. v. Western Union Corp.*[18]—as authority for that proviso.[19]

The second federal action, filed in the same court on May 20, 2013 (the "Federal Derivative Action"), brought both derivative and class action claims against Kerris and the Board (including Raina), and on behalf of Ebix as nominal defendant.[20] As with the Federal Securities Class Action, the Federal Derivative Action took issue with certain disclosures transmitted between May 2009 and June 2011 that, in plaintiffs' view, "falsely portrayed the financial condition of the Company."[21] Further, the complaint asserted that because several proxy statements, including the 2010 Proxy Statement, "contained false and misleading statements regarding Ebix's corporate governance, risk management, and the accuracy of Ebix's financial statements,"[22] equitable relief was appropriate, including "an order invalidating the shareholder vote on the [2010 Plan]."[23] In

States' objection but modified its terms to add the above-quoted proviso. *See* Lyons Aff. Ex. I; Day Aff. Ex. C 17–18. Desert States did not opt out of that settlement. *See* Federal Securities Class Action Order ¶ 6, Ex. A.

[17] 333 F. App'x 414, 420 (11th Cir. 2009).

[18] 675 F.2d 456, 460 (2d Cir. 1982).

[19] Federal Securities Class Action Order ¶ 6 n.1.

[20] Lyons Aff. Ex. E (Federal Derivative Action Compl.) ¶¶ 22–30.

[21] *Id.* at 4.

[22] *Id.* ¶¶ 137–39.

[23] *Id.* at 72; *see also id.* ¶ 138 ("The misrepresentation [sic] and omissions in the 2010, 2011, and 2012 Proxy Statements were material and were an essential link in the reelection of the Individual Defendants, the ratification of CBH as Ebix's

addition to disclosure-based claims, the Federal Derivative Action asserted that Ebix's directors breached their fiduciary duties in at least two ways: (1) causing Ebix to commit waste by commencing a stock repurchase while its stock price was artificially inflated[24] and (2) pressing the Abandoned Merger forward for self-interested purposes, including avoiding "personal liability arising from their participation in the illegal conduct which is at issue in the derivative litigation already pending against the [board]"[25] and "reaping massive financial benefits for themselves."[26] The complaint also noted that Ebix's sale would net Raina "tens of millions of dollars from a change-in-control bonus," a larger ownership stake in Ebix, and continued employment as CEO.[27]

Parties to the Federal Derivative Action eventually agreed to a stipulated settlement (the "Federal Derivative Action Settlement")[28] that the district court approved in a final order and judgment issued December 2, 2014.[29] Although plaintiffs had designated several counts in the complaint as class claims, the order expressly approved the settlement pursuant to Federal Rule of Civil Procedure 23.1

---

auditor, approval of the Stock Incentive Plan, and approval of the 2010 and 2011 executive officer compensation plan, as alleged herein.").

[24] *Id.* ¶ 126.

[25] *Id.* ¶¶ 142–43.

[26] *Id.* ¶ 13.

[27] *Id.* ¶¶ 24, 95.

[28] Lyons Aff. Ex. D (Federal Derivative Action Settlement).

[29] Lyons Aff. Ex. B (Federal Derivative Action Order).

and found that notice of the proposed settlement was sufficient under that rule.[30]

Further, the parties discharging the so-termed "Released Claims" were two representative plaintiffs[31] "acting on their own behalf and derivatively on behalf of Ebix," Ebix, and "each Ebix stockholder."[32]

This time, "Released Claims" were defined as:

> [A]ny and all claims or causes of action (including Unknown Claims), debts, demands, disputes, rights, suits, matters, issues, damages, obligations, or liabilities of any kind, nature, and/or character whatsoever (including, but not limited to, any claims for damages, interest, attorneys' fees, expert, or consulting fees, and any and all other costs, expenses, or liabilities whatsoever), whether known or unknown, whether under federal, state, local, statutory, common law, foreign law, or any other law, rule, or regulation, whether fixed or contingent or absolute, accrued or unaccrued, liquidated or unliquidated, at law or in equity, matured or unmatured, discoverable or undiscoverable, concealed or hidden, asserted, or that have been could or might have been, or in the future might be asserted by Plaintiffs (both individually and derivatively on behalf of Ebix), Ebix, or Ebix's Stockholders, or any of them, against the Released Persons based upon, arising out of, or related to (a) the facts, transactions, events, occurrences, disclosures, statements, alleged mismanagement and/or misconduct, acts, omissions, or failures to act, statement, concealment, misrepresentation, sale of stock, violation of law, or other matter which was or could have been alleged in or encompassed by the Actions, regardless of upon what legal theory based, including, without limitation, claims for negligence, gross negligence, recklessness, fraud, breach of fiduciary duty, breach of duty of care and/or loyalty, or violations of the common law, administrative rule or

---

[30] *See id.* ¶¶ 3, 7.

[31] *See id.* ¶ 5; Federal Derivative Action Settlement ¶¶ 1.9, 1.16, 1.28 (defining the term "Plaintiffs").

[32] Federal Derivative Action Order ¶ 5. As is discussed below, however, "Released Claims" do not include direct claims of Ebix stockholders; only derivative ones. *See infra* Part III.A.2.

regulation, tort, contract, equity, or otherwise of any state or federal statutes, rules, regulations, or common law, or the law of any foreign jurisdiction; or (b) the defense or Settlement of the Actions and or the Released Claims, including the payments provided herein. Nothing set forth herein shall constitute a release by or among the Company and the Individual Defendants or Released Persons of the rights and obligations relating to indemnification and advancement of defense costs arising from the Company's or any of its subsidiary's, division's, or related or affiliated entity's certificate of incorporation or bylaws, Delaware law, or any indemnification agreement or similar agreement. **For purposes of clarity, and without narrowing the scope of the releases provided herein, "Released Claims" only include those claims that can be released under applicable law.** *See, e.g., Thomas v. Blue Cross & Blue Shield*, **333 Fed. App'x 414, 420 (11th Cir. 2009).** Nothing set forth herein shall constitute a release by the Settling Parties of any rights or obligations to enforce the terms of the Settlement embodied in this Stipulation.[33]

The Federal Derivative Action Order repeated the stipulation's disclaimer that "Released Claims only include those claims that can be released under applicable law," before citing the same *Thomas v. Blue Cross & Blue Shield* case.[34]

B.     *The 2014 Corporate Actions*

After this Court's July 2014 Opinion constrained Plaintiffs' ability to challenge pre-2014 conduct by dismissing certain claims, Plaintiffs amended their complaint to include two new counts (Counts IV and V) based on actions Defendants took between August and December, 2014, and a third new count (Count VI) based on disclosures made in a proxy statement issued in advance of Ebix's 2014 annual meeting (the "2014 Proxy Statement"). Counts IV and V

---

[33] Federal Derivative Action Settlement ¶ 1.20 (emphasis added).
[34] Federal Derivative Action Order ¶ 5 n.1.

challenge three actions in particular: (1) Ebix's execution of a Credit Agreement containing a "proxy put" provision (the "Proxy Put"), (2) Ebix's entry into a Director Nomination Agreement with a dissenting shareholder, and (3) the Board's unilateral adoption of a bundle of bylaws (together, the "2014 Corporate Actions"). Plaintiffs characterize each action as an "entrenchment device"[35]—that is, a mechanism the directors endorsed *because of* its functional capacity to help them maintain control of the company or otherwise keep their jobs. This conjecture drives Count IV's assertion that the Board's approval of each 2014 Corporate Action amounts to a breach of fiduciary duty.[36] Count V asserts that the Bylaw Amendments are invalid.[37]

The first 2014 Corporate Action Plaintiffs challenge is the Board's adoption of the Credit Agreement containing the Proxy Put. On August 5, 2014, Ebix, certain Ebix subsidiaries, and various lenders executed a Credit Agreement for a $150 million credit facility.[38] A Proxy Put provision in that agreement enabled lenders to accelerate repayment if a majority of incumbent directors were replaced with persons either the incumbents did not approve or who received a nomination

---

[35] *E.g.*, Compl. ¶ 73.
[36] *Id.* ¶ 133 (asserting that the board's "adoption of additional anti-takeover devices warrants strict scrutiny").
[37] *Id.* ¶ 136.
[38] *Id.* ¶ 74.

11

due to an actual or threatened proxy contest.[39]  Recent amendments to the Credit Agreement, however, removed the Proxy Put.[40]

The second challenged action took place shortly after November 11, 2014, the date on which an activist shareholder, Barrington Capital Group, L.P. ("Barrington"), conveyed an intent to replace four of Ebix's six directors.[41]  That shareholder sent a letter to Raina attributing Ebix's low stock price to pending

---

[39] *Id.* ¶¶ 74–75.

[40] Lyons Aff. Ex. J (Feb. 2015 Form 8-K) Ex. 10.1 § 2(a).  This fact is not in dispute.  *See* Opening Br. in Supp. of Defs.' Mot. to Dismiss the Second Am. Compl. (Opening Br.) 25–27; Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Answering Br.) 8 (conceding that "Defendants have since mooted this claim by removing the proxy put").  On a motion to dismiss, the Court may consider "uncontested factual admissions of the parties contained in the record." *Berger v. Intelident Solutions, Inc.*, 911 A.2d 1164, 1166 n.1 (Del. Ch. 2006).

[41] *See* Compl. ¶¶ 78, 81, 103.  Relevant passages in the Second Amended Complaint do not clearly indicate whether Barrington's plan was to replace four incumbents, place four new directors on the board by adding seats, or otherwise gain control of four board seats through some combination of the two.  This detail matters, of course, because the first scenario would win Barrington majority control of Ebix's six-member Board, while the second would not and third might not.  The ambiguity arises because the Second Amended Complaint describes Barrington's announcement as conveying a plan to "propose four new directors" or "place four independent directors to the Ebix Board"—neither of which clearly denotes replacement.  *Id.* ¶¶ 78, 103.  The Complaint does, however, state that Barrington had "announced a proxy contest" and characterizes Barrington's actions—albeit in conclusory fashion—as amounting to a "threat to [the Board's] control of Ebix."  *See id.* ¶¶ 10, 81.  These allegations, viewed in a light most favorable to Plaintiffs, permit a logical inference that Barrington planned to win majority control of Ebix's Board by replacing incumbents with independent nominees.  *See In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (stating the well-established rule that, in the context of a Rule 12(b)(6) proceeding, a trial court need not accept "every strained interpretation of the allegations proposed by the plaintiff," but rather must "draw reasonable inferences in the plaintiff's favor").

12

litigation and investigations, poor financial reporting, substandard corporate governance and a lack of independent directors, and the Abandoned Merger.[42] Further, Barrington recommended termination of the ABA, which the letter characterized as "egregious."[43] Barrington indicted the ABA's "extremely depressed base price," capacity to be triggered whether or not Raina remained employed by Ebix, functional grant to Raina of a *de facto* "personal veto" over acquisition offers, and contribution to Raina's ability to negotiate favorable terms for himself before the 2013 merger was abandoned.[44]

On November 26, 2014, Ebix entered into a Director Nomination Agreement with Barrington that contemplated expanding Ebix's six-member board to eight, filling the two new seats with Barrington designees, and renominating all six incumbents. It further obligated the Board to support the two Barrington designees and pay Barrington $140,000, and required Barrington to withdraw its prior nominees and vote its shares in favor of Ebix's six renominated incumbents.[45] Further, Barrington relinquished the ability to engage in certain forms of dissenting conduct during an extendable "standstill period."[46] During this period, Barrington must vote all of its stock for the Board's nominees and in harmony with Board

---

[42] Compl. ¶ 78.
[43] *Id.* ¶ 79.
[44] *Id.* ¶¶ 79–80.
[45] *Id.* ¶ 81.
[46] *Id.* ¶¶ 81, 83.

13

recommendations on matters that include advisory executive compensation votes, as well as refrain from soliciting proxies, presenting proposals, or initiating litigation.[47] The standstill period lasted until the earlier of ninety days before Ebix's 2015 annual meeting and ten days before any advance notice deadline for making director nominations.[48] Ebix could extend this period to an equivalent time frame surrounding the 2016 annual meeting, however, by recommending or committing to recommend re-election of Barrington's designees.[49]

The third subset of challenged conduct is Defendants' adoption of a series of bylaws (the "Bylaw Amendments") that had been prepared on November 17, 2014 and adopted on December 19, 2014.[50] A December 1, 2014 Form 8-K discloses Ebix's entry into the Director Nomination Agreement, but no "other planned defensive measures."[51] Nor did a number of other intermediate disclosures mention the Bylaw Amendments, including a December 1, 2014 Joint Press Release of Barrington and Ebix, a December 16, 2014 notice of annual meeting, and the 2014 Proxy Statement.[52] The disclosure revealing the amendments, a

---

[47] *Id.*
[48] *Id.* ¶ 83.
[49] *Id.*
[50] *Id.* ¶ 84.
[51] *Id.* ¶ 85.
[52] *Id.* ¶¶ 84–85.

14

December 24, 2014 Form 8-K, was not sent to stockholders.[53]   The bylaws implement various reforms as described below.

A "Special Meeting Bylaw" regulates stockholders' ability to call and conduct business at special meetings.  It provides that, in the event stockholders owning 10% of Ebix's stock request a special meeting, Ebix's Board will determine the meeting's location and schedule the meeting for a date no later than 120 days after the request.[54]  Stockholders submitting the request must describe the business to be conducted, provide the text of any resolutions, agree that disposition of shares before the record date "revokes the special meeting request as to those shares," update information previously provided within five days of the record date, and provide other information reasonably requested by Ebix.[55]  The Board may add its own matters to the agenda and a Board member sitting as the special meeting's chairman conducts the meeting, decides what business is properly before the meeting, and decides whether to adjourn.[56]  Finally, the Board can deny a special meeting request for seven reasons, including (1) if the request is made "during the period from 120 days prior to the anniversary of the last annual meeting through the earlier of the next annual meeting or 30 days after that anniversary"; (2) if, in the Board's judgment, a "Similar Item" not including the

[53] *Id.*
[54] *Id.* ¶ 86.
[55] *Id.*
[56] *Id.*

election of directors was raised at a meeting within twelve months before the request or a "Similar Item" including an election of directors was presented within 120 days before the request; and (3) if a "Similar Item" appears in the notice "of an annual or special meeting that has been called but not yet held or that is called for a date within 120 days of the request."[57]  These requirements are said to enable the Board to prevent stockholders from ever electing directors at a special meeting.[58]

The "Control of Meeting Bylaw" gives a meeting chairman—either the Chairman of the Board or the Board's designee—discretionary authority over how the meeting is run.[59]  The meeting chairman has authority over who may attend, as well as opening and closing of the polls.[60]

The "Advance Notice Bylaws" impose certain conditions on a stockholder's ability to make a proposal or nominate a director.  Two features of these bylaws are noteworthy: timing requirements and information requirements.  First, the Advance Notice Bylaws create, in certain circumstances, a 30-day window during which stockholders must give notice of proposals and nominations.  That is, if the annual meeting is called to occur on a date within 25 days of the 1-year

---

[57] *Id.* ¶ 87 (internal quotation marks omitted).
[58] *Id.* ¶ 89.  This result does not automatically obtain.  However, Plaintiffs allege that it might if the Board implements the Special Meeting Bylaw's terms, as stated in the Second Amended Complaint, in a strategic manner.  The pleadings can be reasonably read as supporting that comparatively modest inference.
[59] *Id.* ¶ 95.
[60] *Id.*

anniversary of the previous annual meeting, a stockholder's notice of a proposal or director nomination "must be received not fewer than 90 days nor more than 120 days prior to that anniversary."[61] Ebix may then postpone or adjourn the meeting.[62] Second, a stockholder seeking to make a proposal or nomination must disclose certain information about whether and the extent to which that stockholder, its nominee, and/or certain affiliated parties have (i) entered into any transaction, such as an option or short interest, "with respect to" Ebix stock, or (ii) any other arrangement, such as a short position, made to manage risk or increase or decrease voting power or economic interest.[63] Further, stockholders providing such notice must update and supplement information they provide.[64] The chairman of the meeting may decide to bar presentation of a stockholder proposal or nominee, as well as decide whether the bylaws are satisfied.[65]

The "Consent Bylaw" requires a stockholder seeking action by consent to request the Board to specify a record date. The Board then has 10 days from receipt of that request to set a record date.[66] Because the Board may fix a record date occurring up to 10 days after it decides to pass the resolution setting that date,

---

[61] *Id.* ¶ 93.
[62] *Id.*
[63] *Id.* ¶ 94.
[64] *Id.* ¶ 95.
[65] *Id.*
[66] *Id.* ¶ 97.

17

the Consent Bylaw allows action by stockholder consent to be delayed up to 20 days.[67]

The "Indemnification Bylaw" bars "advancement or indemnification of any director who brings an action against the Corporation, including a counterclaim for contribution."[68]

C.    *The 2014 Proxy Statement*

The last new claim the Second Amended Complaint levies is Count VI's assertion that the Board members breached their fiduciary duties by "issuing the materially misleading and incomplete 2014 Proxy Statement."[69] The 2014 Proxy Statement was issued on December 16, 2014 (three days before the Board adopted the Bylaw Amendments) and set a record date of November 13, 2014 for the next annual meeting (the "2014 Annual Meeting"), which was scheduled for January 9, 2015.[70] At the 2014 Annual Meeting, Ebix stockholders were to vote on certain issues, including the proposed reelection of directors and advisory say-on-pay.[71]

The 2014 Proxy Statement allegedly makes the following misstatements and omissions:

---

[67] *Id.*
[68] *Id.* ¶ 98.
[69] *Id.* ¶ 139.
[70] *Id.* ¶¶ 84, 99.
[71] *See id.* ¶¶ 99, 104; *id.* at 2, 68.

18

- Does not mention the Proxy Put or any implications adding Barrington's designees would have on triggering the Proxy Put;[72]

- Describes the Director Nomination Agreement, but does not describe Barrington's letter, Barrington's plan to propose four new directors, or the Bylaw Amendments;[73]

- Provides information on Raina's compensation between 2011 and 2013, but not 2014;[74]

- Discloses Raina's receipt of a $1.2 million retention bonus designed to keep him aboard through the 2013 Abandoned Merger, but obscures other details about what Raina bargained for during negotiations, such as the fact that he would receive a larger equity interest;[75]

- Provides procedural guidance in apparent tension with Ebix's bylaws.[76]

---

[72] *Id.* ¶ 101.

[73] *Id.* ¶¶ 102–03.

[74] *Id.* ¶ 104.

[75] *Id.* ¶ 104.

[76] *Id.* ¶ 106. Plaintiffs allege that the 2014 Proxy Statement's procedural guidance is incorrect in three ways. First, the Complaint asserts that it provides incorrect information concerning the date by which nominations for the 2015 annual meeting must be received. As of December 16, 2014, Ebix's bylaws contained no advance notice bylaw. Three days later, the newly-enacted Advance Notice Bylaw required that notice of nominations and proposals be given within a certain thirty-day window. In Plaintiffs' view, the 2014 Proxy Statement's directive that nominations "must be received by August 15, 2015" comports with neither bylaw regime. Second, Plaintiffs assert that the 2014 Proxy Statement's claim that "[t]he Board applies the same standards in considering candidates submitted by stockholders as it does in evaluating candidates submitted by members of the

In light of these disclosures, Plaintiffs seek a declaration from this Court that the 2014 Proxy Statement is materially misleading and incomplete and that actions approved at the 2014 Annual Meeting, including the election of directors, are invalid, as well as an order requiring Ebix to hold a new annual meeting at which stockholders may make nominations and proposals.[77]

## III. DISCUSSION

Defendants' motion to dismiss raises three principal questions. First, do the settlements approved by the United States District Court for the Northern District of Georgia extinguish some or all of the claims presented in Counts I–III? Second, do Plaintiffs' various challenges to the 2014 Corporate Actions as improper entrenchment devices fail as moot or under Court of Chancery Rule 12(b)(6) for failure to state a claim? Finally, does Plaintiffs' assertion that the 2014 Proxy Statement contains materially false and misleading disclosures fail under Rule 12(b)(6)? Each is addressed in turn.

---

Board" conflicts with the Advance Notice Bylaws. Third, the Complaint challenges deadlines the 2014 Proxy Statement provides by which stockholders must submit proposals under Rule 14a-8 and 14a-4(c); complying with these deadlines, argue Plaintiffs, "would appear to render the stockholder's proposals invalid under the Advance Notice Bylaws." *Id.* ¶ 106. Some of these allegations are factual and others are conclusory. It is not necessary to make those classifications at this juncture.

[77] *Id.* at 68.

A.    *The Effect of the Federal Settlements on Plaintiffs' Claims*

Because the releases in both the Federal Securities Class Action Settlement and the Federal Derivative Action Settlement contain broadly inclusive language, Defendants argue that each precludes claims asserted in this action. Plaintiffs counter with five arguments: (1) Defendants cannot raise the affirmative defense of release in the context of this Rule 12(b)(6) motion; (2) the Federal Derivative Action Settlement cannot release any of Plaintiffs' class claims due to a black-letter law preventing derivative settlements from releasing class claims; (3) neither release has the legal capacity to release Plaintiffs' claims in light of applicable law prohibiting settled claims from releasing class claims that are not based on an identical factual predicate; (4) the Federal Securities Class Action Settlement does not apply to Spagnola and other unspecified class members in this action because this action's putative class diverges from the class certified in the Federal Securities Class Action; and (5) the releases in fact fail to extend to certain claims because the parties did not intend them to.

This section assesses the effect of the federal settlements by proceeding in that order. This Opinion does not address arguments (4) or (5), however, because conclusions reached upon consideration of argument (3) render that exercise unnecessary.

21

1. <u>Whether Defendants May Raise a Defense of Release in the Context of this Motion to Dismiss</u>

Plaintiffs' first argument attempts to avoid Defendants' release defense in its entirety by asserting that this Court may not consider that defense's factual bases—neither the settlement documents themselves nor the various public filings and letters Defendants have also proffered—given this proceeding's procedural posture. According to Plaintiffs, relevant precedent teaches that if the factual bases for affirmative defenses asserted through a motion to dismiss are not "incontrovertibly established by" the pleadings, the tribunal may deny the motion. Accordingly, Plaintiffs argue that dismissal is inappropriate here because the Second Amended Complaint makes no mention of any document—most notably, the releases themselves—upon which Defendants rely. Plaintiffs further argue that Defendants' attempt to use these documents converts their motion to dismiss into a motion for summary judgment, thereby warranting rejection of Defendants' motion to afford Plaintiffs the chance for discovery. Plaintiffs' construction of applicable law, however, is too narrow.

Ordinarily, "the existence of a release is an affirmative defense that must be asserted in a responsive pleading."[78] Nonetheless, this Court has, on multiple occasions, considered releases in deciding motions to dismiss where the complaint

---

[78] *Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. 2011); *see also* Ct. Ch. R. 8(c).

22

referenced or otherwise relied upon the release at issue.[79]  Courts in those cases did not, however, explicitly consider the conceptually distinct question posed here: whether the Court may consider a release in the event the complaint fails to reference it at all.

The answer to that question is a qualified "yes" for the simple reason that the decisions referenced above are properly read as following a broader rule of law which this Court has previously explained as follows:

> Court of Chancery Rule 12(b) provides that if "matters outside the pleading are presented to and not excluded by the Court, the motion [under Rule 12(b)(6)] shall be treated as one for summary judgment and disposed of as provided in Rule 56."  If purportedly extraneous matter is presented, Rule 12(b) implies that the Court may, *sua sponte,* exclude it and hear the motion to dismiss, consider it and convert the motion into one for summary judgment, or conclude it is not extraneous but rather integral to the claims and then proceed with the motion to dismiss.  Indeed, this Court frequently does determine these issues *sua sponte* in its disposition of the underlying motion.[80]

---

[79] *See, e.g.*, *Seven Invs.*, 32 A.3d at 396.  ("The General Release nevertheless can be considered on a 12(b)(6) motion because the Complaint incorporates the Termination Agreement by reference."); *see also Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *2 n.9, (Del. Ch. Feb. 22, 2006) ("The Court may consider the Release in deciding a motion to dismiss because the Complaint makes reference to it.").

[80] *In re Gardner Denver, Inc.*, 2014 WL 715705, at *4 (Del. Ch. Feb. 21, 2014) (citations omitted) (alteration in original).

The record properly before the court on a motion to dismiss under Rule 12(b)(6) includes "allegations in the Complaint, the documents integral to the Complaint, and those matters as to which the Court may take judicial notice under Delaware Uniform Rules of Evidence Rules 201 and 202."[81] This Court has repeatedly held federal court decisions, orders, and filings judicially noticeable.[82] Although Plaintiffs challenge Defendants' alleged reliance on public filings to build their release defense, Defendants submit that this Court need not look beyond the federal court filings to find in their favor.[83] Because this Court takes judicial notice of filings of record in the two Northern District of Georgia actions, it may consider the release defense. Accordingly, Plaintiffs' attempt to nip Defendants' release defense in the bud fails.

2. <u>Whether the Federal Derivative Action Release May Release Direct Claims Asserted by Co-Lead Plaintiffs</u>

Plaintiffs' next argument seeks to accomplish comparatively less. Instead of taking aim at Defendants' release defense in its entirety, their second argument asserts that the Federal Derivative Action Release cannot bar any of Plaintiff's class claims. The Federal Derivative Action Settlement's broad definition of

---

[81] *Metro. Life*, 2012 WL 6632681, at \*12 (considering "documents filed of record" in federal court "that are not likely to be in dispute").

[82] *See, e.g., id.; Beiser v. PMC-Sierra, Inc.*, 2009 WL 483321, at \*1 & n.2 (Del. Ch. Feb. 26, 2009) (collecting cases); *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006).

[83] Tr. of Oral Arg. Def.'s Mot. to Dismiss ("Tr.") 15–16.

"Released Claims" might be read as including direct claims; its express terms provide that "Released Claims" include "any and all claims or causes of action . . . that have been could or might have been, or in the future might be asserted by Plaintiffs (both individually and derivatively on behalf of Ebix), Ebix, or Ebix's Stockholders . . . ."[84]  The Federal Derivative Action Order, however, constrains that definition by clarifying that "Released Claims only include claims that can be released under applicable law."[85]  Plaintiffs assert that because a black letter tenet of applicable law is that representative shareholders in derivative actions cannot release direct claims belonging to absent stockholders, "Released Claims" do not include Plaintiffs' direct claims.

Defendants dispute neither the existence of this rule as phrased nor its pertinence as "applicable law."  Instead, Defendants argue that the Co-lead Plaintiffs in this case, Spagnola and Desert States, should nonetheless be barred from bringing claims because they are not the sort of "people that this general rule is designed to protect."[86]  In support of that contention, Defendants assert that Spagnola and Desert States had actual notice of the Federal Derivative Action Settlement but "[sat] on their hands."[87]  Accordingly, argue Defendants, Spagnola

---

[84] Federal Derivative Action Settlement ¶ 1.20.
[85] Federal Derivative Action Order ¶ 5 n.1.
[86] Reply Br. in Further Supp. of Defs.' Mot. to Dismiss the Second Am. Compl. ("Reply Br.") 7.
[87] *Id.*

25

and Desert States remain bound by the release and the direct claims asserted in Counts I and II fail as a matter of law for lack of a lead plaintiff.

"The judgment in a derivative suit will not preclude any right of action that an absent stockholder might have in the stockholder's individual capacity against the corporation or the real defendants in the derivative suit."[88] Delaware courts have applied this general rule in the context of settlement fairness hearings under Court of Chancery Rule 23.1 by declining to approve derivative settlements purporting to release claims owned by individuals.[89] Discussion on the rationale underlying this rule appears in *Carlton Investments v. TLC Beatrice Holdings, Inc.*,[90] where the Court contrasted structural protections that inhere in Rule 23 class action settlements with those that inhere in Rule 23.1 derivative action settlements.

---

[88] 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1840 (1969–1985). A conceptual knot this Court need not attempt to untangle at present is how this rule might apply in the context of a claim that is simultaneously direct and derivative. *See, e.g.*, *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006). Cleanly applying a bright-line rule may prove problematic in contexts where, as in the case of classifying a given claim as direct or derivative, the lines creating the operative distinction themselves may blur. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 825 A.2d 1031, 1032 (Del. 2004) (cautioning, before clarifying the applicable standard, that "[d]etermining whether an action is derivative or direct is sometimes difficult . . . .").

[89] *In re La.-Pac. Corp. Deriv. Litig.*, 705 A.2d 238, 239–41 (Del. Ch. 1997); *Carlton Invs. v. TLC Beatrice Hldgs., Inc.*, 1997 WL 208962, at *1–2 (Del. Ch. Apr. 21, 1997) ("What the court has no authority to do in this or any other derivative action (putting aside instances of counter or cross claims) is to adjudicate or release claims belonging to persons other than the corporate defendant or those defendants who are validly subject to its jurisdiction and against whom claims have been stated.").

[90] 1997 WL 208962, at *2.

26

The *Carlton* court explained that the existence of a rule preventing a board that has seized control of a derivative claim brought on behalf of the corporation from settling direct claims

> . . . should be obvious, but it may be obscured by the practice in class actions in which the doctrine of virtual representation does allow the rights of a class member to be affected over their objection. But the distinction between class actions (especially (b)(1) and (b)(2) actions where no opt-out rights are provided) and this action is that in the class action setting the party presenting the proposed settlement satisfies all of the requirements of Rule 23 and thus offers protections of the shared right that is subject of the settlement and the settlement will contemplate consideration of some type flowing directly to class members in exchange for the release of their claim. In the derivative action, the corporation does not share rights in the property of its shareholders and may not release or assign that property as part of a settlement of claims that it owns. Nor in the derivative suit settlement does consideration flow directly to shareholders as arguably consideration for the release of their individual claims.[91]

The "property" to which the *Carlton* court referred is the shareholders' right to bring claims on their own behalf—not on behalf of the corporation.[92]

Defendants appear to have obscured the effects of Rule 23 as hypothesized in *Carlton*. Their suggestion that an absentee direct shareholder plaintiff assumed to have actual notice[93] falls outside the ambit of the general rule stated above both contradicts settled law and assuages neither concern noted in *Carlton* concerning

---

[91] *Id.* (internal citations omitted).
[92] *Id.*
[93] The Court need not decide this factual issue and instead assumes it *arguendo*.

27

the relinquishment of another's property and the absence of consideration.[94] When parties to the Federal Derivative Action settled, "applicable law" enabled them to release claims owned by the corporation, not claims owned by Spagnola and Desert States. Accordingly, Plaintiffs are correct that the Federal Derivative Action Settlement does not bar any direct claims asserted in Counts I–III.

This Court has previously held that Count II's disclosure-based claim is direct and Count III's self-payment-based claim is derivative.[95] In light of the above, the Federal Derivative Action Settlement cannot affect Count II but might, subject to additional analysis, release Count III. For reasons stated below, however, neither federal settlement releases Count I. Thus, the Court need not decide its nature as direct or derivative at this juncture.

### 3. Whether Claims in Counts I–III Fall Within the Scope of the Federal Settlement Releases

Both federal settlements' capacity to extinguish this action's state law claims depends on whether settled claims are "based on the 'same identical factual predicate' or the 'same set of operative facts' as the underlying action."[96] Each court-approved settlement release limits its own reach by announcing adherence to

---

[94] These two considerations were also deemed critical in *La.-Pac. Corp.*, 705 A.2d at 240.

[95] *Ebix*, 2014 WL 3696655, at *18.

[96] *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1146 (Del. 2008) (quoting *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006)); *see also Nottingham P'rs v. Dana*, 564 A.2d 1089, 1106–07 (Del. 1989) (providing the standard followed in both *Philadelphia Stock Exchange* and *UniSuper*).

this rule. The Federal Class Action Settlement states that it does not purport to release:

> any claim that does not arise out of the identical factual predicate as the claims settled in this action. *Thomas v. Blue Cross & Blue Shield*, 333 Fed. App'x 414, 420 (11th Cir. 2009); *TBK Partners Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982).[97]

Similarly, the Federal Derivative Action Settlement states that it only releases:

> those claims that can be released under applicable law. See, e.g., *Thomas v. Blue Cross & Blue Shield*, 333 Fed. App'x 414, 420 (11th Cir. 2009).[98]

The *Thomas* case cited in both orders provides, at the pinpoint citation specified in both provisos, the following rule that also appears in the *TBK Partners* case cited in the Federal Securities Class Action proviso:

> [A] court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.[99]

> "Delaware law favors settlements and treats them as binding contracts."[100]

The federal orders will be interpreted using principles of contract interpretation.[101]

---

[97] Federal Securities Class Action Order ¶ 6 n.1.

[98] Federal Derivative Action Order ¶ 5 n.1.

[99] *Thomas*, 333 F. App'x at 420.

[100] *Christiana Care Health Servs. v. Davis*, 2015 WL 6689642, at *3 n.27 (Del. Nov. 3, 2015) (quoting *Crescent/Mach I P'rs, L.P. v. Dr. Pepper Bottling Co. of Tex.*, 962 A.2d 205, 208 (Del. 2008)).

[101] *See In re Heizer Corp.*, 1991 WL 24736, at *2 (Del. Ch. Feb. 25, 1991) ("As a matter of contract interpretation, I have no hesitation in finding that the definition of liquidation value in [a previous order entered by the Court of Chancery] does

The issue for this Court, then, is whether either federal settlement *could have* released claims Plaintiffs have brought in this action by virtue of sharing an identical factual predicate within the meaning of *TBK Partners*, and thereby did or did not achieve as much pursuant to the express contractual terms quoted above. A given claim in this action will be deemed released if either the Federal Securities Action Settlement's release or the Federal Derivative Action Settlement's release properly applies.

In *TBK Partners*, the United States Court of Appeals for the Second Circuit applied the "identical factual predicate" test in the context of a dispute over the value of minority shareholders' interest in a target company absorbed in a short-form merger. There, a representative plaintiff, acting on behalf of a class of minority shareholders, challenged the price offered for the class's stake as too low and brought federal claims on three legal theories: that the acquirer (1) violated federal securities laws by making certain deficient disclosures concerning the minority interest's value, (2) violated its fiduciary duty to the target, in which it owned a 95.3% stake, by effecting a merger on terms that undervalued the minority interest, and (3) violated the terms of a lease by depriving the minority full value

not encompass the environmental claim"); *cf. In re Transamerica Airlines, Inc.*, 2009 WL 2217748, at *4 (Del. Ch. July 22, 2009), *aff'd sub nom. Transamerica Airlines, Inc. v. Akande*, 991 A.2d 19 (Del. 2010).

30

for their interest.[102] The parties eventually agreed to a settlement including a release that had the effect of enjoining class members from bringing state law appraisal claims.[103] Objectors to the settlement argued that the district court lacked authority to extinguish the state law claims that were not and could not have been brought in the federal action.[104] Nonetheless, the district court upheld the settlement and the Second Circuit affirmed, reasoning that "both the class action and the state appraisal proceeding hinge[d] on the identical operative factual predicate: the correct valuation of [the minority interest]."[105]

The *TBK Partners* court explained that barring claims under the "identical factual predicate" rule is analogous to "barring claims that could have been asserted in the class action" so long as "there is a realistic identity of issues between the settled class action and the subsequent suit, and . . . the relationship between the suits is at the time foreseeably obvious to notified class members."[106] Accordingly, the court assessed whether the "gravamen" or "[core] settled questions" of the class action, considered alongside the notice describing the settlement sent to class members, simultaneously enabled objectors to anticipate

---

[102] *TBK P'rs*, 675 F.2d at 458–59.
[103] *Id.* at 459.
[104] *Id.* at 459–60.
[105] *Id.* at 460.
[106] *Id.* at 461.

that their claims would be adjudicated and provided full opportunity to object.[107] The Second Circuit held that the objectors in *TBK Partners* were "fairly apprised" of the fact that their appraisal claims would be extinguished because (1) they were warned that the settlement would broadly release "any claim arising out of or connected with" the federal claims and (2) the federal and state claims were "tightly connected."[108] Because objectors also received full opportunity to object, the settlement justifiably precluded their state law appraisal claims.[109] The Second Circuit characterized operation of the identical factual predicate inquiry as serving the twin goals of "prevent[ing] relitigation of settled questions at the core of a class action" and, more generally, "encouraging settlements."[110]

The Delaware Supreme Court clarified the test's applicability in the context of disclosure claims in *Nottingham Partners v. Dana*.[111] In *Nottingham*, the Court affirmed the Court of Chancery's holding that allegations attacking different particular disclosures were nonetheless based on an identical factual predicate because they challenged the same transaction.[112] The defendant corporation in *Nottingham* issued a proxy statement recommending that stockholders approve a

---

[107] *See id.* at 460–61.

[108] *Id.* ("It would be hard to imagine a claim that would be more tightly connected to those asserted in the class action than a claim in an appraisal proceeding that [defendant] had undervalued the [minority's interest].").

[109] *Id.* at 461–62.

[110] *Id.* at 460–61.

[111] 564 A.2d 1089 (Del. 1989).

[112] *Id.* at 1106–07.

Class B Stock recapitalization and related charter amendments.[113]   After the shareholders approved the transaction, two lawsuits—one bringing federal claims, the other state claims—attacked the proxy statement as materially misleading and challenged the recapitalization and amendments as invalid.[114]   Parties in the state action reached a settlement, but federal plaintiffs objected on the ground that the Court of Chancery lacked authority to release their disclosure claims because they were not based on the same set of operative facts.  Although plaintiffs in the state action conceded that "the disclosure allegations we made were not precisely the same as what [federal plaintiffs] made,"[115] the Court of Chancery concluded that the two actions were based on an identical factual predicate, noting that "the fact that two actions may not involve the precisely identical disclosure claim is not determinative."[116]   Instead, the Court of Chancery focused on both suits' practical attempt to invalidate the same "transaction"—which, in that case, was "the adoption of the Class B plan and the issuance of the proxy statement in order to

---

[113] *Id.* at 1091.
[114] *Id.* at 1092–93.
[115] *Dana v. Trans-Lux Corp.*, C.A. No. 9755, at 14 (Del. Ch. Aug. 4, 1988) (TRANSCRIPT) (settlement hearing).
[116] *Dana v. Trans-Lux Corp.*, C.A. No. 9755, at 6 (Del. Ch. Aug. 4, 1988) (TRANSCRIPT) (ruling of the Court).

solicit the proxies."[117]   The Delaware Supreme Court affirmed the Court of Chancery's conclusions as "correct as a matter of law."[118]

Unlike in *TBK Partners* and *Nottingham*, the claims challenged as precluded in this case do not all spring from a single factual predicate; here, there are several. Remaining discussion in this section applies *TBK Partners* and *Nottingham* by identifying the sets of operative facts underlying Counts I–III and comparing them to those underlying the federal claims in search of overlap.

Count I, which seeks invalidation of the ABA and an injunction preventing Defendants from claiming Raina is entitled to any bonus under it, derives from the factual premise that the Board maintained the ABA as an antitakeover device that depressed Ebix's stock price.  Thus, shorn of all legal paraphernalia, Count I's operative facts might be succinctly characterized as "events and conduct calling into question the ongoing validity of the ABA."  This line-drawing aims to capture the principle from *Nottingham* that a transaction—here, maintenance of the ABA—may serve as the focal point of the inquiry.

*Nottingham* directly informs the search for operative facts underlying Count II, which seeks invalidation of the 2010 Plan due to material misstatements and omissions in the 2010 Proxy Statement.  Because *Nottingham* held that settled disclosure claims may have preclusive effect on pending disclosure claims that

---

[117] *Nottingham*, 564 A.2d at 1107 n.37.
[118] *Id.* at 1107.

challenge different aspects of a given communication so long as the two claims share a common goal—there, challenging stockholders' approval of a recapitalization plan as uninformed and invalid—Count II's operative facts are any allegations of misstatements and omissions in the 2010 Proxy Statement showing that shareholders' approval of the 2010 Plan was uninformed and invalid.[119]

Finally, Count III challenges the Board members' grants of incentive compensation to themselves under the 2010 Plan as a breach of fiduciary duty and seeks rescission of those grants, as well as disgorgement of grants already disbursed. Count III's operative facts, then, include those tending to show that these self-payments were invalid.

Because claims settled in the Federal Securities Class Action Settlement do not share the same operative facts with claims asserted in Counts I–III of this action, that release does not preclude present claims under applicable law and, resultantly, its own express terms. Plaintiffs' allegations in this action, however, traverse a narrow factual pathway to avoid such overlap.

The gravamen of the Federal Securities Class Action is that Ebix, Raina, and Kerris artificially inflated Ebix's stock price by obscuring Ebix's "serious internal control problems" and participation in a "sham tax strategy," as well as misstating net income, diluted earnings per share, and organic growth rates in public filings,

---

[119] *See id.* at 1106–07.

press releases, and conference calls.[120] In particular, plaintiffs in that action challenged disclosures in Forms 10-K for 2009 and 2010, Forms 10-Q for 2009, 2010, and 2011, press releases issued in 2009, 2010, and 2011, and conference calls conducted in 2009, 2010, and 2011. Misstatements and omissions in these public filings and pronouncements, according to the Federal Class Action plaintiffs, artificially inflated Ebix's stock price between May 2009 and June 2011. Critically, the Federal Securities Class Action does not challenge the 2010 Proxy Statement, votes taken at the 2010 Annual Meeting, or the 2010 Plan. Accordingly, although it brings similarly-styled claims (*i.e.*, disclosure claims), the Federal Securities Class Action lacks an identical factual predicate with Count II of this action. And because the Federal Securities Class Action simply has nothing to do with the Board's maintenance of the ABA or usage of the 2010 Plan, the Federal Securities Class Action Settlement has no preclusive effect under *TBK Partners*, *Nottingham*, and the release itself.

Before describing the factual premises underlying the Federal Derivative Action, it is perhaps useful to reiterate that the Federal Derivative Settlement's preclusive capacity is categorically limited. For reasons discussed above, the Federal Derivative Action Settlement can only preclude derivative claims in Counts I and III, not the direct claim asserted in Count II. Thus, although the

---

[120] *See, e.g.*, Federal Securities Class Action Compl. ¶¶ 153–66.

Federal Derivative Action sought, in part, to "invalidate the shareholder vote on the 2010 [Plan]," the settlement reached in connection with that action cannot preclude Count II.[121]

The Federal Derivative Action brought six counts, two of which were expressly designated as direct class claims.[122] Those two direct claims, each challenging the Board's actions surrounding the Abandoned Merger as amounting to a breach of fiduciary duties, seem absent from extant claims settled in the resulting order, which did not purport to certify a class or otherwise comport with Federal Rule 23.[123] Further, the "Actions" the release purports to settle are defined as "the derivative actions"[124] and the stipulation recites that plaintiffs and their counsel concluded that settlement was warranted after investigating facts surrounding "the derivative claims."[125] Thus, the facts underlying those claims

---

[121] Federal Derivative Action Compl. at 72.

[122] *Id.* ¶¶ 140–49.

[123] See Federal Derivative Action Order ¶¶ 3, 7.

[124] The Federal Derivative Action Order settles "Released Claims" and "any and all claims (including Unknown Claims) . . . arising out of, relating to, or in connection with, the defense, Settlement, and resolution of the Actions." The former is defined above. *See supra* note 33 and accompanying text. The "Actions" are defined as "the Federal Action and the State Action." Federal Derivative Action Settlement ¶ 1.1. The "Federal Action" is defined as "the derivative actions that were consolidated and styled as *In re Ebix, Inc. Derivative Litigation*, File No. 1:13-CV-62-RWS (N.D. Ga.)." *Id.* ¶ 1.7. The "State Action" is defined as "the derivative action that is styled as *In re Ebix. Inc. Shareholder Derivative Action*, Case No. 2011VW205276 (Superior Court of Fulton County, Georgia)." *Id.* ¶ 1.26.

[125] Federal Derivative Action Settlement at 7.

could not have been "settled questions at the core" of the Federal Derivative Action and the operative facts animating those claims are irrelevant for present purposes.[126] Allowing those facts to inform this analysis would violate the rationale underlying *TBK Partners*; since, for whatever reason,[127] the direct claims based on the Abandoned Merger were not extant claims being settled, it was not "foreseeably obvious" that claims based on their operative facts would be extinguished.[128]

The remaining four counts challenge an Ebix stock repurchase, disclosures in public filings and statements—including proxy statements issued in 2010, 2011, and 2012—and seek contribution and indemnification against the Board, as well as the creation of a constructive trust. Parsing through these claims in search of one or several discernible factual predicates that overlap with Count I is unnecessary; Defendants fail to provide, and the Court does not discern, any reason to conclude that any of these claims share an identical factual thread with Count I's challenge to the Board's maintenance of the ABA. Accordingly, the Federal Derivative Action Settlement lacks the capacity to preclude Count I.

---

[126] *Cf. TBK P'rs*, 675 F.2d at 462 ("If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981))).

[127] Plaintiffs assert that these claims were mooted once the merger was abandoned in 2013, but offers no facts or law in support of that contention.

[128] *TBK P'rs*, 675 F.2d at 461.

Because the Federal Derivative Action does, however, indirectly challenge the validity of payments made under the 2010 Plan, the release's effect on Count III is a closer call. The Federal Derivative Action does not directly challenge the payments in the same way as the Second Amended Complaint, which asserts that each disbursement was "inherently self-interested" and a breach of fiduciary duty; rather, the Federal Derivative Action Complaint knocks the payments' legs out by attacking the foundational document authorizing their disbursement—the 2010 Plan—as the invalid product of an uninformed shareholder vote. Further, federal plaintiffs did not identify specific disbursements made under the 2010 Plan or explicitly seek disgorgement, but did allege that the 2010 Plan enabled the Board to "receive lucrative stock option awards."[129] Accordingly, the two cases' legal *and* factual pathways that would (hypothetically) result in the disbursements' invalidity differ: the Federal Derivative Action would invalidate the disbursements based on a disclosure theory attacking the 2010 Proxy Statement, while Count III of this action would invalidate them based on a fiduciary duty theory attacking particular Board decisions as inappropriately self-interested. Thus, neither *TBK Partners* nor *Nottingham* is directly on point: *TBK*

---

[129] Federal Derivative Action Compl. ¶ 72.

*Partners* dealt with different legal theories but similar factual particulars and *Nottingham* dealt with similar legal theories but different factual particulars.[130]

Despite sharing a factual predicate—validity of the 2010 Plan—Count III of this action and claims asserted in the Federal Derivative Action do not share an *identical* factual predicate. This follows because answering the core question central to the federal action's disclosure claim—do misstatements and omissions in the 2010 Proxy Statement render the shareholder vote on the 2010 Plan invalid?— will not necessarily resolve Count III. In other words, the success *or* failure of Count III, which hinges on details underlying the self-payments, does not depend on the answer to that core question in the Federal Derivative Action because Count III might successfully invalidate the disbursements even if the federal disclosure claim were to fail. This was not the case in either *TBK Partners* or *Nottingham*, where the released claims would have either succeeded or failed based on the same set of facts that informed or could have informed the core question in the settled action.[131] The practical effect of this factual misalignment is twofold. First, it

---

[130] *Cf. TBK P'rs*, 675 F.2d at 462 (noting that, in a prior case, the court had "refused to affirm the District Court's approval of a settlement that would release distinct claims that not only 'depend(ed) . . . upon a different legal theory but upon proof of further facts'" (alterations in original) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981))).

[131] *Id.* ("Whether the payment results from a breach of fiduciary duty, a breach of the lease, or from an appraisal proceeding, *the same facts support (or limit)* the amount of recovery for the value of the reversionary interest." (emphasis added)); *Nottingham*, 564 A.2d at 1106–07 (holding that two actions were based on the

means that enforcing the Federal Derivative Action Settlement will not "prevent relitigation of settled questions"[132] because the propriety of particular Board decisions to issue compensation was not settled. And second, it makes the relationship between the Federal Derivative Action and this action not "foreseeably obvious."[133] Simply put, it is not obvious that settling the disclosure question would immunize future Board actions not based on disclosures.[134] Accordingly, the Federal Derivative Action could not have released Count III.

In sum, neither federal settlement had the capacity to preclude Counts I–III of this action. The Court need not address Plaintiffs' remaining arguments.

B.     *Whether Entrenchment Claims in Counts IV and V Fail*
       *Under Court of Chancery Rule 12(b)(6)*

1.  Procedural Standard of Review

In considering a motion to dismiss for failure to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6), the Court will accept all well-pleaded facts as true, accept even vague allegations in the complaint if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover

---

same set of operative facts where both hinged on whether disclosures in the same proxy rendered the same shareholder vote invalid).

[132] *TBK P'rs*, 675 F.2d at 460.

[133] *Id.*

[134] The Second Amended Complaint challenges options disbursed to directors following Ebix's 2010, 2011, 2012, and 2013 annual meetings whose value totaled approximately $800,000. Compl. ¶ 57.

under any reasonably conceivable set of circumstances.[135] Allegations that are merely conclusory will not be accepted as true.[136]

## 2. Analysis

Count IV purports to bring both class and derivative claims against the Board on the grounds that approving the Proxy Put, the Director Nomination Agreement, and the Bylaw Amendments amounted to a breach of fiduciary duties. Plaintiffs further argue that the 2014 Corporate Actions are defensive measures whose adoption warrants strict scrutiny under *Unocal Corp. v. Mesa Petroleum Co.*[137] and its progeny. Count V purports to bring a class and derivative claim that the Bylaw Amendments "are invalid because they are inconsistent with provisions of the Delaware General Corporation Law and Ebix's bylaws and/or inconsistent with Delaware law."[138] Defendants' motion challenges Count IV's Proxy Put claim as moot and remaining claims under Counts IV and V as failing to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6). Because Plaintiffs concede that Defendants mooted the Proxy Put claim by removing it, that aspect of Count IV is dismissed. Another concession further

---

[135] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).
[136] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000).
[137] 493 A.2d 946 (Del. 1985).
[138] Compl. ¶ 136.

narrows analysis: Plaintiffs acknowledge that they "are not challenging the facial validity of the bylaws like in *Boilermakers*."[139]

Defendants argue that the business judgment rule applies to the 2014 Corporate Actions because none is a defensive measure that would trigger heightened scrutiny under *Unocal*. In particular, they argue that adopting the Director Nomination Agreement was not defensive for two reasons. First, adding two insurgents to the board "is the antithesis of an entrenching action"[140] and characterizing that concession as defensive would otherwise be inconsistent with cases in which Delaware courts have failed to locate a defensive action in the absence of a looming threat. Second, Defendants argue that such a holding would allow for the "perverse result" of encouraging directors to oppose activists in proxy fights instead of appointing dissidents to the board since either decision would, in Defendants' view, give rise to an entrenchment claim.[141] Further, Defendants argue that adopting the Bylaw Amendments was not defensive because it occurred on a "clear day"; that is, the Barrington threat had ended roughly one month prior to the bylaws' adoption and the Second Amended Complaint supplies no other plausible threat. Finally, Defendants argue that the complained-of conduct was

---

[139] Answering Br. 45. *See also Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.2d 934 (Del. Ch. 2013).
[140] Reply Br. 20.
[141] Opening Br. 28.

"neutral and proportionate as a matter of law" because Plaintiffs "must—but cannot—show that the measures were not reasonable."[142]

Plaintiffs respond by arguing that because the Second Amended Complaint adequately pleads facts showing that the Board adopted each 2014 Corporate Action in response to the threat posed by Barrington, *Unocal* is triggered. In addition, Plaintiffs argue that because heightened scrutiny, once triggered, requires Defendants to prove that their actions were reasonable and facts before this Court do not establish reasonableness as a matter of law, dismissal is inappropriate.

Section 141 of the Delaware General Corporation Law empowers the board of directors of a Delaware corporation to conduct the corporation's business and affairs.[143] Directors carrying out that function owe fiduciary duties of loyalty and care to the corporation and its shareholders.[144] In assessing whether the directors' conduct amounts to a breach of their fiduciary duties in a given scenario, Delaware courts use three standards of review: the business judgment rule, enhanced scrutiny, and entire fairness.[145] The business judgment rule is applicable by default and presumes that "in making a business decision the directors of a corporation

---

[142] *Id.* 29–30.
[143] 8 *Del. C.* § 141(a).
[144] *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).
[145] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[146]

The Delaware Supreme Court has identified certain scenarios, however, that by their nature generate concerns requiring the Court to conduct a more searching inquiry.[147] Enhanced scrutiny under *Unocal* applies "whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches on issues of control."[148] As this court noted in *Stroud v. Grace*, *Unocal* may also apply in contexts aside from a board's adoption of a defensive measure in response to a hostile takeover attempt; *Unocal* has also "applied to a preemptive measure where the corporation was not under immediate 'attack'"[149] but nonetheless enacted a measure "in contemplation of an ephemeral threat that could somehow materialize in the future."[150]

---

[146] *Aronson v. Lewis*, 473 A.3d 805, 812 (Del. 1984).

[147] *See, e.g., Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986); *Unocal*, 493 A.2d at 954–55; *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983).

[148] *Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009) (quoting *Santa Fe*, 669 A.2d at 71).

[149] *Stroud v. Grace*, 606 A.2d 75, 82 (Del. 1992) (quoting *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1350–53 (Del. 1985)).

[150] *Kahn v. Roberts*, 679 A.2d 460, 466 (Del. 1996) (quoting *Moran*, 500 A.2d at 1350–53).

"Once the plaintiff establishes that defensive measures have been employed in the context of a contest for control, the Board has the burden of showing (1) that it 'had reasonable grounds for believing that a danger to corporate policy and effectiveness existed,' and (2) 'that [its] defensive response was reasonable in relation to the threat posed.'"[151] A board that successfully carries this burden wins reinstatement of the business judgment rule as the applicable standard of review.[152]

*Unocal*'s threshold question of whether a defensive action has occurred is a matter of some significance in the context of a motion to dismiss.[153] In the event a complaint pleads nonconclusory facts sufficient to support the characterization of a given board's action as defensive, the burden shifts to the board to prove the reasonableness that action. Yet, as the Court in *Santa Fe* observed, the activation of heightened scrutiny poses a systemic difficulty for defendants seeking dismissal under Court of Chancery Rule 12(b)(6), given the limited record from which they might draw to demonstrate reasonableness.[154] This is a point worth clarifying given Defendants' backwards suggestion that Plaintiffs' failure to *disprove* reasonableness is dispositive even if this Court finds Defendants' actions were defensive. To the contrary, plaintiffs certainly have no incentive to plead facts

---

[151] *Santa Fe*, 669 A.2d at 71 (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 (Del. 1995)).
[152] *Id.*
[153] *See id.* at 72.
[154] *Id.*

46

showing a board acted reasonably, and when *Unocal* applies the board does not "enjoy a presumption to that effect."[155] That said, "it does not necessarily follow that an allegation that a board adopted a defensive device will always state a claim."[156]

Both the Director Nomination Agreement and the Bylaw Amendments contain mechanisms that might help Ebix's incumbent management maintain control of the company in some manner. The Director Nomination Agreement's standstill and voting provisions prevent Barrington—an activist shareholder which had voiced dissatisfaction with both particular business decisions and incumbent management in general—from soliciting proxies, presenting proposals, or voting against Board-recommended matters and nominees. And the Bylaw Amendments both impose certain constraints on shareholder action and grant the Board greater dominion over meetings, nominations, and proposals—including an ability to prevent shareholders from electing directors through the medium of a special meeting in ratcheting time intervals. For reasons that follow, however, enhanced scrutiny under *Unocal* only applies to the Board's approval of the Bylaw Amendments.

---

[155] *Id.*

[156] *In re Gaylord Container Corp. S'holders Litig.*, 1996 WL 752356, at *2 (Del. Ch. Dec. 19, 1996).

Entry into the Director Nomination Agreement cannot be viewed as defensive for purposes of triggering *Unocal*. After Barrington threatened to launch a proxy contest for majority control of Ebix's board on November 11, 2014, the Individual Defendants made the strategic decision to come to the bargaining table instead of mounting outright opposition.[157] The Director Nomination Agreement, entered into on November 26, 2014, reflects mutual concessions presumably in line with each contracting party's intent: Barrington principally received two board seats and thereby a say in managing the affairs of Ebix, and Ebix received a guarantee that Barrington would abate dissenting behavior during the standstill period.[158] Applying *Unocal* to the Board's agreement to *give up* board seats, though conceivable as entrenching insofar as that concession was part of a *quid pro quo* earning Ebix the extinction of Barrington's not-yet-launched proxy contest, is counterintuitive. A corporate action with collateral effects including a tendency to preserve incumbent control is not *per se* subject to *Unocal* scrutiny;[159] and

---

[157] Compl. ¶¶ 78–81.

[158] *Id.*

[159] *See, e.g., Gantler*, 965 A.2d at 705 n.23 ("Rejecting an acquisition offer, without more, is not 'defensive action' under *Unocal*." (citing *Kahn v. MSB Bancorp, Inc.*, 1998 WL 409355, at *3–4 (Del. Ch. July 16, 1998), *aff'd*, 734 A.2d 158 (Table) (Del. 1999))); *Stroud*, 606 A.2d at 83 (holding that a private contract between shareholders and a private company whose "defensive effects" were "collateral at best" would not receive *Unocal* scrutiny); *Doskocil Cos. Inc. v. Griggy*, 1988 WL 85491, at *6–7 (Del. Ch. Aug. 18, 1988) (holding, in the context of a motion for a preliminary injunction, that plaintiffs failed to establish a reasonable likelihood of success of showing that *Unocal* applied to a board's

applying *Unocal* under the specific facts of this case would sponsor the enigmatic idea that the Board's decision to dilute its own control of the corporation by surrendering board seats to insurgents is best viewed as a defensive action. Simply put, because Ebix opened its doors to Barrington, approving the Director Nomination Agreement does not qualify as the sort of entrenchment device viewed as categorically suspect under *Unocal*.

Plaintiffs have, however, pled facts sufficient to support an inference that the Bylaw Amendments were entrenchment measures related to a potential change in control. The Second Amended Complaint establishes a factual chronology that, viewed in a light most favorable to Plaintiffs, supports Plaintiffs' contention that the Board adopted the new bylaws to stave off Barrington. Three facts in particular support this inference. First, the Bylaw Amendments were prepared on November 17, 2014, six days after Barrington conveyed an intent to launch a proxy contest.[160] The record properly before the Court provides no facts exposing this temporal proximity as coincidental—for example, nothing indicates the Board had been considering the Bylaw Amendments for some time before Barrington entered the picture. And although the Board did not adopt the bylaws until December 19, 2014, by which time Barrington was contractually barred from running a slate, that

---

decision to approve the issuance of preferred stock containing a put provision that triggered certain penalties in the event of an acquisition).
[160] Compl. ¶ 85.

49

sequence does not end the inquiry given the second fact: the Director Nomination Agreement's standstill provision lasts, at most, roughly two years.[161] Third and finally, although most of the Bylaw Amendments achieved little more than making shareholder action more cumbersome, one reform in particular has clear defensive value: the Special Meeting Bylaw's series of clauses that allow the Board, at the very least, to delay stockholder-initiated special meetings for 120 days and, at most, prevent elections from occurring at special meetings indefinitely. Bylaw amendments enacting shorter special meeting delay periods have received *Unocal* scrutiny in past cases.[162]

These three facts, considered in concert, permit the inference that the Bylaw Amendments were, in the aggregate, a forward-looking prophylactic designed with Barrington in mind, but holstered until the period of Barrington's guaranteed complacency expired. Delaware law supports the imposition of *Unocal* scrutiny in this sort of scenario—that is, one where a board implements defensive measures in

---

[161] *Id.* ¶ 83.

[162] *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 38–43 (Del. Ch. 1998) (applying *Unocal* to a bylaw amendment that gave the board of directors authority to set a time and place for special meetings called by stockholders and required that such meetings take place "not less than ninety (90) nor more than one hundred (100) days after the receipt and determination of the validity" of the shareholder request); *Kidsco v. Dinsmore*, 674 A.2d 483, 487–89, 494–97 (Del. Ch. 1995) (applying *Unocal* to a bylaw amendment that extended the minimum allowable time for calling a stockholder-initiated special meeting from 35 days to 60 days).

response to a threat to corporate control that is not immediate, but rather perceived as a future possibility.[163]  Accordingly, heightened scrutiny applies.

Defendants strenuously dispute the appropriateness of this result because, in their view, the Director Nomination Agreement eliminated the Barrington threat and the Second Amended Complaint supplies no alternative ephemeral threat sufficient to trigger *Unocal* under *Moran*.[164]  This argument lacks precedential support and is fatally shortsighted. None of the cases Defendants cite in support of this contention controls because none involves a purposive response to a known threat: in *Goggin v. Vermillion, Inc.*, the board accused of entrenchment did not know of the threat at the time it made the challenged decision;[165] in *Kahn v. Roberts*, there was no hostile bidder and "no real probability of any hostile acquirer emerging or that the corporation was 'in play'";[166] and the defendant board members in *Doskocil Cos. v. Griggy* had been considering the challenged action for more than a year before the threat emerged and "neither asked for nor wanted" the allegedly defensive feature of the provision at issue.[167]  Although Barrington could not run a slate at the time Ebix adopted the Bylaw Amendments, that is only

---

[163] *See supra* notes 149–50 and accompanying text.
[164] *See Kahn*, 679 A.2d at 466 (citing *Moran*, 500 A.2d at 1350–53, for the proposition that board actions "in contemplation of an ephemeral threat that could somehow materialize at some point in the future" trigger enhanced scrutiny under *Unocal*).
[165] 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011).
[166] 679 A.2d at 466.
[167] 1988 WL 85491, at *6.

half of the story. The rest—which includes Barrington's known future capacity to re-initiate dissenting behavior and the bylaws' conception closely after Barrington's emergence—creates, at least, a reasonable inference that improper motives were at work.[168]

These conclusions, however, do not necessarily require the dismissal of claims related to the Director Nomination Agreement and the survival of claims related to the Bylaw Amendments. Count IV's claim that the Board members breached their fiduciary duties by approving the Director Nomination Agreement may yet state a claim for breach of fiduciary duty if well-pled facts overcome the presumptions of the business judgment rule.[169] Further, Counts IV and V's challenge to the Bylaw Amendments do not automatically state a claim because heightened scrutiny applies. Following discussion ties up these loose ends.

Count IV's claim that the Board breached their fiduciary duties by approving the Director Nomination Agreement fails to state a claim because well-pled facts do not give rise to a reasonable inference that the Board did not act "on an informed basis, in good faith and in the honest belief that the action was taken in

---

[168] *See Gantler*, 965 A.2d at 705 (affirming the Court of Chancery's determination that *Unocal* did not apply because it could not be "reasonably . . . inferred that the defendants acted 'defensively'").
[169] *See id.* at 705–06.

the best interests of the company."[170]  The Complaint, which instead focuses on proving an entrenchment motive, does not allege that the Board was uninformed or otherwise failed to adequately contemplate the merits of executing the Director Nomination Agreement.  Further, the pleadings supply no facts calling into question a majority of Board members' disinterestedness.[171]  Accordingly, because entry into the Director Nomination Agreement is clearly attributable to a rational business purpose, this Court will not substitute its own business judgment for that of Ebix's Board. Count IV's claim that the Board members breached their fiduciary duties by entering into the Director Nomination Agreement is therefore dismissed.

---

[170] *Id.* (quoting *Aronson*, 473 A.2d at 812); *see also Kahn*, 679 A.2d at 466 (affirming the Court of Chancery's dismissal of breach of fiduciary duty claims to which the business judgment standard of review, not heightened scrutiny, applied because the plaintiff failed assert facts rebutting the business judgment rule's presumptions).

[171] Even if the Second Amended Complaint successfully alleged that Ebix's individual directors approved the Director Nomination Agreement for the self-interested purpose of entrenchment, that fact, without more, might nonetheless fail to state a claim for breach of the duty of loyalty. *See Gantler*, 965 A.2d at 707 ("By its very nature, a board decision to reject a merger proposal could always enable a plaintiff to assert that a majority of the directors had an entrenchment motive.  For that reason, the plaintiffs must plead, in addition to a motive to retain their corporate control, other facts sufficient to state a cognizable claim that the Director Defendants acted disloyally.").

Aspects of Counts IV and V premised on the Board's approval of the Bylaw Amendments, however, survive. In this case, heightened scrutiny requires Ebix's board members to show, on the face of the Second Amended Complaint, that their adoption of the Bylaw Amendments was "within the range of reasonableness."[172] Defendants have provided no argument explaining why the Bylaw Amendments, considered collectively,[173] fall within that range as a matter of law. Instead, Defendants attempt to vindicate each bylaw individually by citing cases upholding similar token bylaws using diverse standards of review and under different procedural postures.[174] None considers the reasonableness of a salvo of new provisions accomplishing the number and nature of reforms at work here—which include (1) giving the Board authority to set the time and place of special meetings, adjourn special meetings for certain reasons, prevent elections from occurring through special meetings for lengthy periods of time, and delay action by consent for twenty days; (2) imposing information and notice requirements on shareholders

---

[172] *Santa Fe*, 669 A.2d at 72.

[173] "Where all of the target board's defensive actions are inextricably related, the principles of *Unocal* require that such actions be scrutinized collectively as a unitary response to the perceived threat." *Unitrin*, 651 A.2d at 1387 (citing Gilb*ert v. El Paso*, 757 A.2d 1131, 1145 (Del. 1990)).

[174] *See, e.g., Stroud*, 606 A.2d at 75 (reversing the Court of Chancery's invalidation of an advance notice bylaw variant); *Mentor Graphics Corp. v. Quickturn Design Sys. Inc.*, 728 A.2d 25, 38–43 (Del. Ch. 1998) (upholding a special meeting bylaw variant challenged on *Unocal* and *Blasius* grounds after a trial on the merits); *Kidsco Inc. v. Dinsmore*, 674 A.2d 482, 496–97 (Del. Ch. 1995) (upholding a special meeting bylaw variant challenged on *Unocal* grounds in the context of a motion for a preliminary injunction and for summary judgment).

who request special meetings or submit nominations or proposals; and (3) vesting discretionary authority in a meeting chairman. Although many of the complained-of features, as noted earlier, only give rise to inconvenience, the reasonableness of a defensive response whose munitions include the ability to foreclose the use of special meetings to hold elections requires an explanation not evident on the face of these pleadings. Accordingly, those aspects of Counts IV and V challenging adoption of the Bylaw Amendments as entrenchment devices withstand Defendants' motion.[175]

C.    *Whether the Disclosure Claims in Count VI Fail Under Court of Chancery Rule 12(b)(6)*

Count VI of the Second Amended Complaint purports to bring a class claim against the Board members for breaching their fiduciary duties of care and loyalty by "issuing the materially misleading and incomplete 2014 Proxy Statement."[176] Defendants have moved to dismiss this claim under Court of Chancery Rule 12(b)(6) on the basis of three principal arguments: (1) failure to plead materiality adequately; (2) failure to prove reliance and causation, or some other "connection" between the disclosures and the election of directors; and (3) failure to plead a "cognizable measure of relief."[177]

---

[175] *See Santa Fe*, 669 A.2d at 72; *Gaylord Container*, 1996 WL 752356, at \*2.
[176] Compl. ¶ 139.
[177] Reply Br. 45.

Directors' fiduciary duties of care and loyalty give rise to a related duty "to observe proper disclosure requirements."[178] This so-termed duty of disclosure aims, in part, to ensure that stockholders asked to approve a given action have all material information needed to vote on an informed basis.[179] In an action alleging breach of the duty of disclosure, "[t]he essential inquiry" is materiality, a standard that "is determined with respect to the shareholder action being sought."[180] Although the materiality standard does not require a given omission to "have caused the reasonable investor to change his vote," information is material and must be disclosed if there exists "a substantial likelihood that [it] would have been viewed . . . as having significantly altered the 'total mix' of information made available."[181] The Court's determination of a given misstatement or omission's

---

[178] *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998); *RBC Capital Mkts., LLC v. Jervis*, 2015 WL 7721882, at *29 (Del. 2015) ("The Board's 'fiduciary duty of disclosure, like the board's duties under *Revlon* and its progeny, is not an independent dut[y] but the application in a specific context of the board's duties of care, good faith, and loyalty.'" (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001))).

[179] *See Crescent*, 846 A.2d at 987.

[180] *Malone*, 772 A.2d at 12.

[181] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 945 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 426, 449 (1976)); *see also Crescent*, 846 A.2d at 987–88 (framing the rule as applicable to misrepresentations and omissions).

materiality is a mixed question of fact and law decided from the standpoint of a reasonable stockholder.[182]

Disclosure suits challenging alleged misstatements or omissions made in connection with a request for shareholder action that seek injunctive relief do not require the plaintiff to address reliance, causation, or quantifiable money damages.[183] Instead, the presence of a connection between the challenged disclosure and the shareholder action is sufficient.[184] More fundamentally, plaintiffs seeking injunctive relief on the basis of disclosure claims must have standing.[185] The elements of standing are as follows:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the

---

[182] *RBC*, 2015 WL 7721882, at *29 ("Whether disclosures are adequate 'is a mixed [question] of law and fact, requiring an assessment of the inferences a reasonable shareholder would draw and the significance of those inferences to the individual shareholder.'" (quoting *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del. 1992))); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 18 (Del. Ch. 2002); *Crescent*, 846 A.2d at 988; *see Cede & Co. v. Technicolor, Inc.*, 636 A.2d 956, 957 (Del. 1994).

[183] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 53 (Del. Ch. 2014).

[184] *Malone*, 722 A.2d at 12; *Dubroff v. Wren Hldgs.*, LLC, 2010 WL 3294219, at *5 (Del. Ch. Aug. 20, 2010); *cf. Alessi v. Beracha*, 849 A.2d 939, 944 (Del. Ch. 2004) ("*Malone* teaches that '[a]n action for breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the element[] of reliance.'" (alternations in original)).

[185] *Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *4 (Del. Ch. Feb. 20, 2009).

independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[186]

Accordingly, this Court has found past occasion to dismiss a disclosure claim at the motion to dismiss stage for lack of a redressable injury.[187]

Here, Plaintiffs challenge the 2014 Proxy Statement for things it says and does not say about the Director Nomination Agreement, the Barrington threat, Raina's compensation, the Bylaw Amendments, and the (now mooted) Proxy Put. Plaintiffs take issue with the 2014 Proxy Statement's failure to describe the factual context from which the Director Nomination Agreement sprung, an omission which, in Plaintiffs' view, inappropriately clouds the Board's motivations. Further, Plaintiffs argue that the 2014 Proxy Statement contains misleading information about Raina's salary because it both omits his 2014 compensation information and fails to adequately describe the arrangement Raina negotiated for himself in the Abandoned Merger despite disclosing his $1.2 million retention bonus in connection with the same deal. Finally, the Second Amended Complaint avers that the 2014 Proxy Statement both fails to mention the Bylaw Amendments and misstates certain procedural requirements those bylaws would impose.

---

[186] *Id*. (alterations in original) (italics omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[187] *Id.* at *4–5 (finding a lack of standing where plaintiff asserting disclosure claims sought relief in the form of new disclosures and new elections because neither would redress any alleged harm in light of defendant corporation's entry into Chapter 7 liquidation).

58

Because Plaintiffs suppose that these misstatements and omissions befouled stockholder approvals at the 2014 Annual Meeting, including a Board election and an advisory say-on-pay vote, Plaintiffs ask this Court to declare them invalid and order a new annual meeting at which stockholders may submit nominations and proposals.

Count VI fails to state a claim because Plaintiffs have failed to identify misstatements or omissions in the 2014 Proxy Statement that are "material with respect to the shareholder action being sought."[188] Plaintiffs challenge two forms of shareholder action sought in the 2014 Proxy Statement: (1) a vote on director elections and (2) an advisory say-on-pay vote.[189] Accordingly, the challenged disclosures must be material and "connect[ed] to the request" for those actions.[190] For reasons that follow, a reasonable shareholder would not think the complained-of disclosures altered the "total mix" of information made available with respect to the election and say-on-pay vote.[191] This discussion organizes the disclosures into

---

[188] *Malone*, 722 A.2d at 12.

[189] *See* Compl. ¶¶ 99-106. Through the course of litigating this Motion to Dismiss, Plaintiffs have failed to argue that the alleged misstatements and omissions they identify are material with respect to any other shareholder action sought in the 2014 Proxy Statement. Arguments to that effect are therefore waived. *See King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 360 n.21 (Del. Ch. 2010), *rev'd on other grounds*, 12 A.3d 1140 (Del. 2011) ("A party's failure to raise an argument in its answering brief on a motion to dismiss constitutes waiver of that argument.").

[190] *Malone*, 722 A.2d at 12.

[191] *See Rosenblatt*, 493 A.2d at 945.

the following three categories: (1) disclosures about the Proxy Put, Bylaw Amendments, and Director Nomination Agreement; (2) disclosures about Raina's compensation; and (3) disclosures providing procedural guidance for the 2015 annual meeting.

Challenges to the disclosures concerning the Proxy Put, Bylaw Amendments, and factual background to the Director Nomination Agreement fall short of the applicable standard. Omissions about the Proxy Put have been mooted,[192] and the stockholders were not asked to vote on the Director Nomination Agreement or the Bylaw Amendments—an unsurprising circumstance given that the Board had not adopted the Bylaw Amendments at the time the 2014 Proxy Statement was issued. Nonetheless, Plaintiffs claim that a reasonable stockholder might have viewed incumbent directors and Barrington's designees with a "jaundiced eye" had they known of the Bylaw Amendments and the fact that the Director Nomination Agreement arose after Barrington announced its plan to propose four new directors.[193] This limited conceptual nexus does not salvage either alleged omission. Ebix's directors were under no obligation to unveil the Bylaw Amendments preemptively in a proxy soliciting votes on two unrelated items. And in any event, the Board disclosed the Bylaw Amendments in a public filing issued on December 24, 2014—over two weeks before the annual meeting

---

[192] *See supra* note 40 and accompanying text; *supra* Part III.B.2.
[193] Compl. ¶¶ 102–03.

scheduled for January 9, 2015. Further, the informational value of a disclosure conveying the particulars of Barrington's letter is dubious given the breadth of information already disclosed in the 2014 Proxy Statement, which included descriptions of the Director Nomination Agreement, Barrington's standstill obligations, and the addition of two Barrington designees who would receive Board support.[194] Accordingly, a reasonable stockholder would not think these omissions significantly altered the "total mix" of information relating to the actions sought.

Although the alleged omissions concerning Raina's compensation are "connected" to both the election and the advisory say-on-pay votes,[195] they are not material. Both omissions identified by Plaintiffs criticize the 2014 Proxy Statement for failing to disclose compensation that Raina had not actually received. Plaintiffs complain that 2014 compensation figures should have accompanied 2011–2013 figures, but do not allege that Raina had in fact received 100% of his 2014 compensation as of mid-December when the 2014 Proxy Statement was issued.

[194] *Cf. Dias v. Purches*, 2012 WL 4503174, at *9 (Del. Ch. Oct. 1, 2012) ("The drafters of an S4 or proxy statement face the difficult task of providing stockholders enough information to make an informed decision while simultaneously not miring the reader in insignificant details."); *Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del. Ch. June 12, 1995) ("[T]he law ought guard against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure. In some cases the opposite will be true.").

[195] The Second Amended Complaint alleges that all directors—including Raina and the Compensation Committee—were up for re-election at the 2014 Annual Meeting. Compl. ¶¶ 99, 104.

Thus, the pleadings do not support an inference, and this Court will not assume, that a complete 2014 figure was actually available.[196] Further, disclosure of an incomplete figure might have been possible, but nonetheless difficult to interpret, misleading, or subject to subsequent modification. Similarly, Plaintiffs' suggestion that the 2013 figure is materially incomplete because the 2014 Proxy Statement does not disclose the compensation arrangement Raina bargained for *but did not receive* in connection with the Abandoned Merger goes too far. What the 2014 Proxy Statement does disclose—the $1.2 million retention bonus Raina in fact received—is far more relevant to an election and say-on-pay vote. In short, the Board was under no duty to disclose one unrealized aspect of an eighteen month old terminated deal.

The final batch of challenged disclosures, which itself contains three pieces of procedural guidance on submitting shareholder nominations and proposals for the 2015 annual meeting,[197] does not provide a basis for liability for two reasons. First, each disclosure was true at the time the 2014 Proxy Statement was issued.[198]

---

[196] *See Gen. Motors*, 897 A.2d at 168 ("A trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' . . . .).

[197] Those three items are: (1) the date by which nominations for the 2015 annual meeting must be received; (2) the standards the Board applies in considering candidates submitted by stockholders; and (3) the date(s) by which stockholders must submit proposals for the 2015 annual meeting. Compl. ¶ 106.

[198] "Directors are required . . . to provide a balanced, truthful account of all matters disclosed in the communications with shareholders." *Malone*, 722 A.2d at 12.

Plaintiffs do not argue that the 2014 Proxy Statement's guidance on either the 2015 annual meeting's shareholder proposal submission deadline or the standards the Board would use to consider stockholder nominees conflicted with Ebix's then-existing bylaw regime.[199] And Plaintiffs' argument that the 2014 Proxy Statement provided a contemporaneously incorrect deadline for 2015 shareholder nominations submissions fails. At the time, Ebix had no advance notice bylaw[200] and this Court has, in the past, recognized directors' ability to set an advance notice deadline for future meetings in a proxy statement in the absence of such a bylaw.[201] Accordingly, the pleadings fail to sustain an inference that the 2014 Proxy Statement contained false information.

Second, these disclosures are not material in relation to the 2014 Proxy Statement's solicitations for shareholders' approval of incumbent directors and advisory say-on-pay at the 2014 Annual Meeting. Once again, the conceptual nexus Plaintiffs provide—that directors who provide misleading procedural disclosures are less attractive candidates—is attenuated. None of the complained-of procedural guidance affected shareholders' understanding of how to, say, submit

---

[199] *See* Compl. ¶ 106.
[200] *Id.*
[201] *See Goggin v. Vermillion*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011) (holding, in the context of a motion for a preliminary injunction, that a party had failed to establish a reasonable probability of success on the merits of its claim that an advance notice requirement created in a proxy statement was an "unwarranted defensive and entrenching behavior by the Board").

nominations or proposals for the 2014 Annual Meeting. And the fact that procedural guidance relating to the 2015 annual meeting later became obsolete is unremarkable given its correction (upon Ebix's December 24, 2014 public filing disclosing the Bylaw Amendments) far in advance of that meeting.[202] Relatedly, as was noted in discussion of Defendants' alleged omission of Raina's 2014 compensation figure, a disclosure designed to conform preemptively to the not-yet-adopted Bylaw Amendments might have required revision should the Board have ultimately decided to adopt those amendments in modified form or not at all. Thus, Plaintiffs overstate these disclosures' materiality with respect to the challenged election.

For all of these reasons, the alleged misstatements and omissions, whether considered individually or collectively, are not material with respect to the challenged shareholder actions. Count VI is dismissed.

## IV. CONCLUSION

For the foregoing reasons, Count IV is dismissed in part; its challenge to the Board's approval of the Proxy Put is dismissed as moot and its challenge to the Board's approval of the Director Nomination Agreement as a breach of fiduciary

---

[202] The 2014 Proxy Statement provides an August 15, 2015 deadline for receipt of nominations for the 2015 annual meeting. Plaintiffs argue the correct deadline is between September 11 and October 11, 2015. Compl. ¶ 106. Either way, stockholders had ample time to appreciate the correction that Plaintiffs allege was necessary.

duties is dismissed for failure to state a claim under Rule 12(b)(6).  Count VI is dismissed.  Otherwise, Defendants' Motion to Dismiss is denied.

**IT IS SO ORDERED.**


_____
*/s/ John W. Noble*
Vice Chancellor